# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAVID JEWELL, | § | |
| | § | No. 394, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No.  2109014213 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: January 8, 2025
Decided:    March 31, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED.**

Elliot Margules, Esquire, OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant David Jewell*.

Julie M. Donoghue, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR,** Justice, for the Majority:

The defendant was convicted of stalking, harassing, and terroristically threatening his ex-girlfriend. He made the threats while in prison via telephone and text message; they were numerous and, by any measure, vile. For the most part, the evidence of the threats consisted of recordings of the phone calls and a log of the text messages. The communications reveal that, during the calls and within the text messages, the defendant repeatedly interjected a racial slur now commonly referred to euphemistically as "the N-Word."[1] The slurs were not, however, directed to the ex-girlfriend nor were they integral to the specific threats directed at her.

Before trial, the defendant moved to redact the racial slur from the phone-call recordings and text messages and exclude any reference to it. Defense counsel stated the obvious—that the epithet was "an inflammatory offensive word"—and argued that it was irrelevant to the charged offenses and likely to cause prejudice to the defendant. The trial court disagreed, ruling that, because the defendant uttered the offensive word, he had no basis to object to the jury's hearing that he did. The court did not consider whether the probative value of the defendant's repeated use of the racial slur was substantially outweighed by its prejudicial effect, a failure that, we hold, was error.

---

[1] *See Resolution: NAACP Official Position on the Use of the Word "N*****" and the "N" Word*, NAACP (2014).

2

This is not the only issue the defendant raises in this appeal. He also challenges two purportedly deficient jury instructions he did not object to at trial, raises a double jeopardy claim as to two pairs of terroristic-threatening counts, and claims that, as to one count in the 27-count operative indictment, the evidence was insufficient to support a conviction. But the issue that commands most of our attention in this opinion centers on the trial court's denial of the defendant's redaction request. The questions we must answer are whether the erroneous admission of the challenged evidence is subject to harmless-error analysis and, if it is, whether the error was harmless; we answer both questions in the affirmative. And because we conclude that the other arguments Jewell raises are without merit, we affirm his convictions.

I

A

While serving an eight-year sentence at the Sussex Correctional Institution for a 2018 felony-assault of an ex-girlfriend,[2] David Jewell was indicted on one count of stalking, one count of committing an act of intimidation, one count of harassment and multiple counts of terroristic threatening. The alleged victim in the stalking count and in each of the harassment counts was another former girlfriend of Jewell's,

---

[2] In addition to Jewell's eight-year sentence for the second-degree assault conviction, he received a one-year prison sentence for a violation of probation related to a prior felony conviction for non-compliance with bond conditions.

Andrea Jordan. Jordan was also the object of most of the threats alleged in the terroristic threatening counts.

The record as we have it does not say much about the history of Jewell and Jordan's relationship or the catalyst—if there was one—for the barrage of nasty messages Jewell sent Jordan's way from early 2021 through Jordan's request for help from the New Castle County Police Department in September of that year. We do know, however, that Jordan had then known Jewell—described by Jordan as her "ex"—for nearly 20 years. During their time together, Jordan gave birth to one child by Jewell, a daughter—A.J.[3]—who was 11-years old when the relevant communications between Jordan and Jewell occurred. Jordan described her relationship with Jewell as "intense"[4] at the beginning. Throughout their relationship, Jordan perceived Jewell as "angry, jealous, [and] possessive."[5]

The communications that concern us here occurred between February 2021 and September 2021. Although Jordan's trial testimony touching on communications before then was limited, we can infer that Jewell and Jordan spoke and texted frequently in relation to Jewell's court-ordered contact with A.J. Whether the tenor of their correspondence changed drastically in early 2021 is unclear. No

---

[3] The Court has adopted the parties' practice of substituting the initials of the minor victim for her name.
[4] App. to Opening Br. at A175.
[5] *Id.* at A182.

4

such doubt surrounds what Jewell actually said to Jordan in the conversations and messages that form the basis of the offenses with which he was charged; the phone conversations were recorded and the text messages were produced with no challenge to their accuracy.

We choose to burden neither this opinion nor the reader's sensibilities with a recitation of each of Jewell's threatening statements; as suggested, their vulgarity is likely to evoke disgust. For this reason, we provide but a modest sampling of the relevant statements and, for completeness' sake, relegate the balance to an appendix that follows our opinion.[6]

- In a February 28, 2021 telephone conversation which forms the basis of Count III of the indictment, Jewell told Jordan: "I will beat [Jordan's sister, Heather's] husband's head into the concrete when I get out . . . . I will make him swallow his teeth."

- In a June 2, 2021 telephone conversation, which forms the basis of Count XII of the indictment, Jewell told Jordan: "I'm going to catch a life charge off of you when I get home. I'm afraid of what I'm going to do to you. . . . Not only am I coming after you, but I'm coming after Lisa because she's hooking you up with guys. And her husband, I'm gonna to f*** him up when I get out. . . . I'm coming after Lisa's husband. . . . Any MFer that's with you when I get out, I will destroy. You need to know that. . . . My mom's dead. I have nothing to live for anymore. You understand what I am saying to you? And a b****-a** PFA is not gonna keep me away. Bring the MFing dude around your house when I get out and watch what I will do. . . . Listen to me. You're gonna pay for this. . . . Watch. You're gonna pay . . . . Andrea, I'm coming to Virginia when I get out. I'm coming for Lisa. Let her husband know, when you see him, tell him I'm gonna beat his f****** teeth down his throat. . . . Listen I hope you die and I hope [A.J.] dies.

---

[6] *See* Appendix A.

5

You understand me? I'm gonna show you how real I am, MFer. You're dead to me, b****, you hear me? . . . I'm coming for you when I get out. You hear me? Watch, watch, watch. . . . I'm not coming after you, I'm coming after Lisa's husband for f****** bringing guys around you. . . . Andrea, listen, I'm coming for you when I get out. You won't hear from me for another three years but watch your back when I get out. You hear me? I swear on [A.J.]'s beating heart. Watch your back."

- In a September 10, 2021 text message sent to Jordan, Jewell wrote: "Tell your b**** boy, I'm gonna f****** beat the s*** out of him when I get my hands on him!! . . . I'm not going away until I taste your mans blood on my hands!" This message formed the basis of Count XXIV of the indictment.

- In a September 17, 2021 text message sent to Jordan, Jewell wrote: "Just wait, have ur s*** shot up while [A.J.] n you sleeping whore! . . . ur dead, [A.J.]s dead, drew's dead, watch." This message forms the basis of Count XXV of the indictment.

- In a September 27, 2021 telephone conversation, which forms the basis for Count XXII of the indictment, Jewell warned Jordan "Andrea, Andrea, listen to me. I'm going to kill you when I get out, do you understand that? I'm f****** going to set you on fire and I'm going to f****** beat the f*** out of Drew. You hear me? Listen to me clearly. Listen to me clearly. No, listen to me. I'd do life. I'm going to kill you. I'm coming home for you. I'm going to kill you. I'm going to kill you. You hear me? I'm going to kill you. I swear on my daughter's beating heart I'm gonna come home and kill you. You understand me? I swear on everything. You better hope they don't, you better hope they don't let me out of jail, mother*****. . . . I'm telling you right now, and I swear on my dead mom, I am coming home and I'm gonna put a bullet in your f****** chest and I'll kill [A.J.], too. You understand me? I'm coming home to kill you. I swear to God, I'm coming home to kill you. And [A.J.]. You hear me? I'm coming home to kill you and [A.J.]. Goodbye . . . ."

Based on the numerous vitriolic phone conversations and text messages, a New Castle County grand jury returned a 54-count indictment, charging Jewell with stalking, an act of intimidation, 15 counts of harassment, and 37 counts of terroristic

6

threatening. The charges spanned from February through September 2021. As the case progressed, through dismissal and amendments, the indictment was whittled down to 27 counts—one count of stalking, one count of harassment, and 25 counts of terroristic threatening.

B

Although Jewell moved *in limine* before trial to exclude certain evidence, his motion did not mention the inclusion of numerous racial epithets in the recorded telephone calls and text messages that the State intended to introduce to establish Jewell's terroristic threats. Apparently, Jewell raised that issue for the first time at a pretrial conference.[7] We infer this to be the case from the prosecutor's statement to the trial judge after the jury was sworn, but before opening statements. Outside the jury's presence, the prosecutor reminded the trial judge that "[Jewell's] counsel indicated on [sic] the pretrial conference that he did object to the use of the N word in the State's text messages"[8] and that the State intended to refer to those messages in its opening statement.

When pressed to identify the messages the State intended to mention in its opening statement, the prosecutor referred to a document the State planned to mark as an exhibit and, more specifically, to the following text message:

---

[7] The record as we have it does not contain a transcript of this pretrial conference.
[8] App. to Opening Br. at A39.

7

You wanna leave me for another man, n expect me to be happy? RUFS. I'm in a rage n HE will pay for stepping on my toes!!!! Ur a f***ing coward for ignoring my calls. Cuz ur new man won't let you take my calls. Cus ur new man won't let you TT me, keep think he's safe [Redaction] U know how I am I will retaliate. I pray some [unredacted N-word] rapes [A.J.] n I pray ur grandchild dies of covid whore! I'm gonna make ur life hell. I'm blocking u again soon as I take care of something![9]

Jewell's counsel responded that the racial epithets in this and other text messages should be redacted. According to counsel, the inclusion of the "N-Word" was "incendiary . . . and not necessary."[10] Counsel argued that "[t]he term isn't necessary to argue that there's a threat contained in the text."[11] Expanding on his concern, counsel observed that the epithet was "an inflammatory[,] offensive word" and that the jury's "focus should be on the threat, not the epithet."[12]

In turn, the State argued that inclusion of the epithet was necessary and would assist the jury in understanding the effect that Jewell's threats had on the victim. The State further advised the court that, if the epithet was used as "a gratuitous slur directed at the victim, the State has redacted that out."[13] But the State made clear that it had not redacted the epithets when they were "part of the threat."[14]

---

[9] *Id.* at A521.
[10] *Id.* at A40.
[11] *Id.* at A41.
[12] *Id.* at A42.
[13] *Id.* at A41.
[14] *Id.* at A42.

Neither party cited Delaware case law relevant to the admission of racially charged evidence in criminal trials. And neither party urged the court to consider the admissibility of the evidence under Delaware Rule of Evidence 403, which permits a trial court to exclude evidence if its probative value is substantially outweighed by its prejudicial effect. With the jury sworn and waiting for the trial to begin, the court addressed Jewell's application:

> I don't think it's the Court's responsibility, nor is it the State's responsibility to sanitize comments that the defendant made. So I'm going to deny that application. I'm going to deny it in just about every case, because unless he didn't say it, then you don't have any basis for objecting to it. I will, however, give an instruction to the jury to the effect that - - and they've already been screened during voir dire, because they've been previewed with a question that says there may be evidence which includes the use of racial epithets. I'll get a little more specific with them and tell them that they will hear the N word used. They're not to base their verdict on the simple fact that the defendant used that word, but rather on the substance of the allegations as part of what was said. So they shouldn't find him guilty because he used that word, but rather if they do, it's because the State has proved the substance of the charges beyond a reasonable doubt. I don't think it's on the State's burden to clean up essentially what the defendant said, nor is the Court's burden to sanitize what he said in a case where the allegation includes terroristic threatening and harassment and stalking.[15]

Although the State had argued in favor of admitting the challenged messages based on its careful redaction of the epithet when it appeared to have been used gratuitously and not as "part of the threat," it interpreted the trial court's ruling as

---

[15] *Id.* at A42–44.

9

allowing the messages to be published to the jury without any redactions at all. Without telling the court, the State eliminated most of the redactions from the redacted document that it had proffered during the pretrial conference.

As promised during the pretrial conference, the State read the previously quoted text message in which Jewell expressed his hope that an awful fate would befall Jordan's daughter and grandchild, replacing the epithet with the euphemistic "N-word." And during the State's case-in-chief, the jury heard or read Jewell's use of that epithet over 140 times.

After a four-day trial during which the jury listened to the relevant phone conversations and were presented with over 200 pages of text messages, the jury found Jewell guilty of all charges. At sentencing, the Superior Court declared Jewell a habitual offender under 11 *Del. C.* § 4214(c)[16] and sentenced him to life in prison plus 25 years.[17]

---

[16] 11 *Del. C.* § 4214(c) provides that "[a]ny person who has been 2 times convicted of a felony under the laws of this State . . . and 1 time convicted of a Title 11 violent felony, or attempt to commit such a violent felony . . . and who shall thereafter be convicted of a subsequent Title 11 violent felony, or attempt to commit such a violent felony . . . shall receive a minimum sentence of the statutory maximum penalty provided elsewhere in this title for the fourth or subsequent felony which forms the basis of the State's petition to have the person declared to be an habitual criminal, up to life imprisonment . . . ."

[17] The indictment in this case capped a two-decades long history of abusive and violent attacks in which Jewell victimized his former wife and girlfriends. We count no less than nine separate terroristic-threatening arrests in Jewell's history before this case, in all of which the threats and other alarming conduct were directed toward either a current or former wife or girlfriend. Included in these incidents were numerous companion charges, including harassment, assault (at both misdemeanor and felony levels), witness-tampering and breach of bond conditions. The majority of these cases were resolved by way of plea bargains resulting in misdemeanor pleas and

10

## C

During the proceedings in this Court, questions arose concerning the reliability of the State's representation to the trial court at the pretrial conference and to this Court in the State's answering brief that the State only left the epithet unredacted when it was "used . . . as part of a threat."[18] Because the text messages were presented to the jury in a 204-page document with well over one thousand messages containing numerous redactions, the State's redaction methodology was hard to decipher. This prompted the Court to direct the State to file a supplemental brief identifying with particularity the specific communications that formed the basis for the terroristic threatening counts in the indictment.

The State's supplemental brief was revealing. Only one statement by Jewell in the communications the State identified as constituting threats contained the racial epithet, and in that one statement, the epithet had been redacted. Said another way, none of the threatening statements contained the epithet; all of the epithets were extraneous to the threats. Equally confounding was that the text message the State quoted in its opening statement was not among the threatening statements identified by the State.

---

probationary sentences, though two—separate convictions in 2012 for stalking and witness-tampering—resulted in felony convictions and Jewell's incarceration.

[18] *See* Answering Br. at 13.

## D

The arguments Jewell raises on appeal are five-fold. For starters, Jewell contends that the Superior Court erred when it overruled his objection to the inclusion of the racial epithet in the recordings of the offending phone calls and log of text messages. Although Jewell's objection in the trial court was not grounded in constitutional considerations, he thus grounds it now and argues that the error is immune from harmless-error analysis and hence reversible. Jewell follows this first argument with two claims of error—neither preserved in the trial court—relating to the court's jury instructions. More specifically, Jewell asserts that the trial court committed plain error by failing to inform the jury of a material element of the stalking charge and by not providing a specific-unanimity instruction. Jewell next argues that two pairs of the many terroristic threatening charges allege "identical [] or entirely overlapping conduct"[19] and, consequently, run afoul of the Double Jeopardy Clause. And Jewell rounds out his appellate claims by challenging the sufficiency of the evidence as to one specific terroristic-threatening count for failure to identify the person who was threatened.

---

[19] Opening Br. at 21.

II

A

Jewell's lead argument on appeal challenges the trial court's admission, over his objection, of the evidence of his persistent use of a racial epithet—so abhorrent that the euphemism, "N-word," is now almost universally used in its place—during his conversations with, and in his text messages to, Jordan. The prejudicial effect of this evidence, according to Jewell, substantially outweighed its limited probative value, and thus the jury should not have been exposed to it. But, as noted above, the trial court did not balance the probative value and prejudicial effect of the evidence, which was, Jewell argues, an abuse of discretion. And though Jewell grounded his objection in the rules of evidence—specifically D.R.E. 403—he now argues that the trial court's error was constitutional in magnitude and not susceptible to harmless-error analysis.

In response, the State argues that Jewell's repeated use of the epithet was properly considered by the jury because, in each instance, the epithet was inextricably tied to the offense of terroristic threatening.[20] The State also suggests

---

[20] In its answering brief, the State unequivocally tied the relevance of the epithet to the terroristic threatening charges. Answering Br. at 3, 13. It hewed to that position during the September 18, 2024, argument before a three-Justice panel. But at the January 8, 2025 argument before this Court *en banc*, the State changed tack and argued instead that the inclusion of the N-word had probative value as to a determination of Jewell's mental state, a required element of his stalking and harassment charges. Video of Oral Argument, *Delaware Supreme Court*, at 24:49–26:05 (Jan. 8, 2025), https://vimeo.com/1044733397.

that, even though the Superior Court's evidentiary ruling is devoid of any reference to D.R.E. 403 or the balancing test the rule contemplates, the court "implicitly" balanced probative value and prejudicial effect and did so within the bounds of its discretion. And from the State's point of view, even if the Superior Court erred, its error was harmless beyond a reasonable doubt.

As we approach the unsettling issues surrounding the use of racially-charged evidence in a criminal prosecution, we find it worth repeating that, in the trial court, neither party cited or referred to D.R.E. 403 or the line of cases that they now concede are relevant to our analysis. Though they escaped notice below, we review those guideposts here.

(i)

This Court has wrestled for decades with the problems inherent in a jury's exposure to racially-charged evidence in criminal prosecutions. Our opinions line up on a spectrum occupied at one end by a case involving a prosecutor's gratuitous and unfounded suggestion of racial animus on the defendant's part and at the other end by instances in which the defendant's use of a racial epithet bears relevance to the defendant's intent and state of mind. Where a given case falls along this spectrum will bear on the admissibility of the evidence and the standard by which we will review it.

14

*Weddington v. State*[21] falls on the former end of the spectrum. In *Weddington*, the defendant, a Black male who was charged with the attempted murder of his white girlfriend,[22] took the stand and, among other things, explained the reason why he and several people had once travelled to see the victim in Indiana, Pennsylvania, and eventually bring her back to Wilmington. During Weddington's cross-examination, the following exchange took place:

> Q. Mr. Weddington, isn't it true that you got [Edmund] Blue and [William] Henry to go up to Indiana with you because you told them there was [sic] some *loose white women* up there?
>
> A. I don't know what you're talking about.[23]

Weddington's counsel objected and moved for a mistrial, arguing that the State had introduced racial prejudice into the case in an effort to "show that . . . [Weddington] [was] prejudiced . . . ."[24] When pressed to explain the basis for his question, the prosecutor admitted that he had no "information, statements from witnesses, or verifiable police reports"[25] to support the factual predicate of his question. The trial court, even so, denied Weddington's motion for a mistrial but agreed to instruct the jury to disregard the question and answer, an ameliorative that

---

[21] 545 A.2d 607 (Del. 1988).

[22] Weddington admitted to a prior romantic involvement with the victim but that the relationship had ended before the events at issue occurred.

[23] *Weddington*, 545 A.2d at 610 (emphasis in original).

[24] *Id.*

[25] *Id.*

15

defense counsel begrudgingly agreed to as "better than nothing."[26]   The jury convicted Weddington, and he appealed.

On appeal, Weddington argued that the prosecutor's question was so prejudicial that it compromised the impartiality of his trial.   The State was commendably candid in its response, acknowledging that "the prosecutor's question to Weddington could be viewed as creating a racial bias against Weddington based on a cultural fear of miscegenation."[27]   The State conceded that, if seen in that light, the question was improper.

Because the State's confession of error did not automatically require the reversal of Weddington's conviction, this Court engaged in an independent analysis to determine whether the error warranted reversal.  Recognizing that "[o]ther courts have held that when racial prejudices are improperly injected into a criminal trial, 'the due process and equal protection clauses overlap or at least meet,'"[28] this Court's essential holding was more pointed:  "A question which improperly injects race as an issue before the jury poses a serious threat to a fair trial. . . .   Such a question violates the fundamental fairness which is essential to the very concept of justice."[29]

---

[26] *Id.* at 611.

[27] *Id.*

[28] *Id.* at 613 (quoting *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 159 (2d Cir. 1973)).

[29] *Id.*

16

This determination did not, however, answer the ultimate question: whether the error—the trial court's denial of Weddington's motion for mistrial—was reversible. Weddington argued—and the State agreed—that a constitutional error occurred as a consequence of the prosecutor's "loose white women" question. And that error, according to both Weddington and the State, invoking the review standard endorsed under certain circumstances by the United States Supreme Court in *Chapman v. California*,[30] was not harmless beyond a reasonable doubt. The Court indulged the parties, conducted a harmless-error analysis, and concluded that the error was not harmless beyond a reasonable doubt.

But the *Weddington* Court did not stop there. In a twist that is relevant to Jewell's argument here, the Court emphasized that the conclusion that the trial court's error was not harmless beyond a reasonable doubt was "not the basis for our holding in [Weddington's] case."[31] The Court observed that *Chapman* recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error."[32] It then concluded:

> In our opinion, the right to a fair trial that is free of improper racial implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error. . . . Accordingly, we find that the present case falls into the category of constitutional

---

[30] 386 U.S. 18, 22 (1967) (fashioning "a harmless-constitutional-error rule" the application of which depends on the reviewing court's satisfaction beyond a reasonable doubt that the error did not contribute to the defendant's conviction).

[31] *Weddington*, 545 A.2d at 614.

[32] *Id.* (quoting *Chapman*, 386 U.S. at 23).

17

violations to which, as *Chapman* recognizes, the harmless error rule does not apply. . . . We also hold, as a matter of Delaware law, that the improper injection of race as an issue into a criminal proceeding violates the right of due process which is guaranteed to all defendants in a criminal case under the Constitution of this State.[33]

Not surprisingly, *Weddington* forms the centerpiece of Jewell's argument in this case. But *Weddington* is not this Court's last word on this topic; in the three-and-a-half decades since *Weddington* was decided, this Court has on several occasions addressed the admission of racially-charged evidence in circumstances that vary from Weddington's. We address those next.

Ten years after *Weddington*, this Court was presented with an opportunity to address the circumstances under which a racist remark attributed to a criminal defendant might be admissible at trial. In *Zebroski v. State*,[34] the defendant, who had been convicted of a capital murder and sentenced to death, argued that the trial court erred in allowing testimony concerning a statement he made in which he admitted to shooting the victim—more specifically, that he said that he "shot the n*****" because he "wouldn't give up the money."[35] Zebroski had argued to the trial court that the statement was "evidence of an unacceptable point of view . . . and not probative of an intent on his part to kill [the victim] out of a sense of racial

---

[33] *Id.* at 614–15.
[34] 715 A.2d 75 (Del. 1998).
[35] *Id.* at 78.

18

hatred."[36] The State had countered that the evidence was highly probative in that it rebutted Zebroski's claim that the shooting was accidental.

Unlike what happened in this case, the trial court in *Zebroski* weighed the evidence under D.R.E. 403 and found

> that the probative value of the evidence, including the epithet, outweighs the risk of unfair prejudice. The statements not only represent, if they're believed, admissions by the defendant that he committed the offense, they are also highly probative as to the defendant's state of mind in terms of his intent and his motive.[37]

We reviewed this ruling for abuse of discretion, mindful of *Weddington* but distinguishing it in at least one material respect. We viewed *Weddington* as applicable to "deliberate attempts to create racial bias"[38] in a way that violates a defendant's "basic right to a 'fair trial that is free of racial implications.'"[39] We recognized that, by contrast, although the remark attributed to Zebroski was "unfortunate and possibly inflammatory,"[40] it was not offered to prove Zebroski's abstract racial beliefs but, rather, was probative of his intent and state of mind at the time of the shooting. Accordingly, we concluded that the trial court had not abused its discretion in allowing the jury to hear the racial epithet.

---

[36] *Id.* at 79.
[37] *Id.*
[38] *Id.*
[39] *Id.* (quoting *Weddington*, 545 A.2d at 614–15).
[40] *Id.*

19

Less than a year after *Zebroski* came *Floudiotis v. State*.[41]  In that case—an appeal by multiple defendants of assault and conspiracy convictions—the defendants contended that "the trial court erred in admitting several items of evidence that impermissibly introduced irrelevant racist views of the defendants in a prosecution of crimes not motivated by the victim's race."[42]  The challenged evidence consisted of a racially offensive remark ("I'm going to have some black meat tonight") attributed to one of the defendants, identification photographs showing clothing and tattoos with white-supremacist images, and an officer's testimony that some of the defendants bore swastika tattoos.[43]  We note that the trial court promptly struck the swastika reference from the record and later instructed the jury to disregard the statement.

Our analysis of the *Floudiotis* defendants' claim highlighted the importance of the trial court's "duty to act as a gatekeeper in its admission or exclusion"[44] of potentially prejudicial evidence and the role of D.R.E. 403 in that process:

> D.R.E. 403 in particular requires the trial court to balance the probative value and the prejudicial effect of proffered evidence to determine whether the probative value is substantially outweighed by the danger of unfair prejudice.

> The trial court's duty to balance evidence under D.R.E. 403 becomes especially important when the evidence tends to be racially

---

[41] 726 A.2d 1196 (Del. 1999).
[42] *Id.* at 1202.
[43] *Id.* at 1201.
[44] *Id.* at 1202.

charged. In past decisions, this Court has carefully reviewed the trial court's rulings in such situations. The improper injection of race as an issue into a criminal proceeding violates a defendant's constitutional right of due process. Racial evidence proffered to establish only a defendant's abstract beliefs or to create a bias against the defendant clearly violates this standard. But in situations where the racial evidence is inextricably tied either to the charged offense or the actual victim of the offense, the trial court has broad discretion to admit the evidence upon a finding that the relevance and probative value outweigh the prejudice to the defendant.[45]

Our decision addressed the identification photographs, offensive comments, and swastika reference separately and found each to be problematic and reversed the defendants' convictions. Two aspects of our decision in *Floudiotis* are pertinent here. First, we recognized that the case "differ[ed] from *Weddington* in that the racial evidence in that case had no proper purpose whereas this racial evidence arguably has some relevance to the State's theory of prosecution."[46] When the evidence has "no proper purpose," it is irrelevant and must be excluded. When, on the other hand, the evidence has some arguable relevance to the State's theory of prosecution, it must pass muster under D.R.E. 403's balancing test or else be excluded. Second, although a full-blown harmless-error analysis was not applied to the swastika reference, which, as we have said, was the subject of a curative instruction, we did suggest that such an analysis might have been required had the case not been reversed on other grounds.

---

[45] *Id.* at 1202–03 (footnotes omitted).
[46] *Id.* at 1205.

21

Fast forward to 2007 and our order in *Pierce v. State*.[47]   Pierce, who was incarcerated pending trial on murder and related firearm charges, wrote letters to three potential witnesses urging each of them to fabricate alibis for him.  In one of the letters, which was admitted at Pierce's trial, Pierce described people on the street as "niggaz" and claimed that "Allah" was on his side.[48]   Pierce was convicted of murder in the second degree and the related charge.  On appeal, he argued that the Superior Court erred by not redacting the racial epithet and religious reference.

Relying on the cases discussed above—*Weddington*, *Zebroski*, and *Floudiotis*—this Court emphasized that racial or religious evidence may be admissible at the discretion of the trial judge when the evidence is "inextricably tied either to the charged offense or the actual victim of the offense."[49]   Moreover, "evidence is not per se excludable where the racial epithets are attributable to a defendant and are admitted for a proper evidentiary purpose."[50]   But, as the Court previously made clear in *Weddington* and *Zebroski*, admitting such evidence to establish a defendant's abstract beliefs or to create bias against him violates a defendant's constitutional due-process rights.   And the Court once again underscored the centrality of D.R.E. 403 to the trial court's consideration of evidence

---

[47] 937 A.2d 140, 2007 WL 3301027 (Del. Nov. 8, 2007) (TABLE).
[48] *Id.* at *1.
[49] *Id.* at *3 (quoting *Floudiotis*, 726 A.2d at 1203).
[50] *Id.*

of this sort, warning that "[i]f the injection of racial animus into trial is unnecessary and excessively prejudicial, then the defendant's due process rights are violated."[51]

Applying this by-then well-established framework, the *Pierce* Court concluded that the racial epithet and religious reference "were not tied to the charged offenses or the victim and were [not] used for a proper evidentiary purpose."[52] But notably, the Court did not reverse Pierce's convictions. Instead, pointing to testimony from three witnesses that Pierce admitted to killing the victim and the fact that the offending evidence consisted of a mere "two words,"[53] the Court concluded that the failure to redact the offending language was harmless beyond a reasonable doubt.[54]

With the principles laid down in these cases in mind, we turn back to the questions at hand: Did the Superior Court err by not ordering the redaction of the exhibits that evidenced Jewell's repeated use of the N-word? And if the court erred, is the error reversible? Our discussion first addresses the admissibility of the

---

[51] *Id.* at *4.

[52] *Id.* In the order as reported by WestLaw, the quoted sentence does not contain the bracketed "[not]" as we have inserted here. Having carefully considered the context in which the sentence was written, including the Court's ruling, we are satisfied that the omission of "not" in the reported order was a typographical error.

[53] *Id.*

[54] We note, however, that the *Pierce* court did not apply the standard, adopted in *Chapman v. California*, 386 U.S. 18 (1967) and discussed in greater length later, for determining whether an error is harmless beyond a reasonable doubt.

challenged evidence.    After that, we consider whether the admission of that evidence, if improper, is grounds for reversal.

(ii)

As we observed in *Floudiotis*[55] and *Pierce*,[56] when a defendant challenges the admissibility of evidence, our review is limited "to determining whether the trial court abused its discretion in admitting the challenged evidence."[57]  For us, this is not a close call:  the trial court's failure to conduct the required balancing of probative value and prejudicial effect of the challenged evidence under D.R.E. 403, an exercise the necessity of which was firmly established under our law, was an abuse of—or perhaps, more accurately, a failure to exercise—its discretion.

D.R.E. 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  As noted earlier, "[t]he trial court's *duty* to balance evidence under D.R.E. 403 becomes *especially important* when the evidence tends to be [as here] racially charged."[58]

---

[55] 726 A.2d at 1202.
[56] *Pierce*, 2007 WL 3301027, at *3.
[57] *Floudiotis*, 726 A.2d at 1202.
[58] *See supra* pp. 20–21 (quoting *Floudiotis*, 726 A.2d at 1202–03).

The State does not contest that the trial court was required to evaluate Jewell's objection under D.R.E. 403's guidance.  But in its answering brief, it elides altogether the trial court's apparent failure to consider D.R.E. 403.  Instead of addressing this failure, the State contends in its answering brief that the racially charged evidence was offered for a proper purpose—to assist the jury in "understand[ing] the threat . . . and how [the racially charged] language in the threat affected her."[59]  At oral argument, the State shifted its position and argued that the trial court had conducted "an implicit weighing under [D.R.E.] 403."[60]  Neither of these justifications for the admission of the challenged evidence withstands scrutiny.

Turning first to the notion that the trial court conducted an "implicit" D.R.E. 403 analysis, we look to what the trial court actually said when confronted with Jewell's objection.  The court's analysis was straightforward; as quoted above at greater length, it stated:

> I don't think it's the Court's responsibility, nor is it the State's responsibility to sanitize comments that the defendant made.  So I'm going to deny that application.  I'm going to deny it in just about every case, because unless he didn't say it, then you don't have any basis for objecting to it . . . I don't think it's on the State's burden to clean up essentially what the defendant said, nor is the Court's burden to sanitize what he said in a case where the allegation includes terroristic threatening and harassment and stalking.[61]

---

[59] Answering Br. at 13.
[60] Video of Oral Argument, *Delaware Supreme Court*, at 15:38–15:41 (Sept. 18, 2024), https://vimeo.com/1010662080.
[61] App. to Opening Br. at A42–44.

There was no balancing here, only a blunt ruling that if Jewell uttered or wrote the racial epithets, he was stuck with them.

If the trial court's plain words leave any doubt about whether it balanced the probative value and prejudicial effect of the evidence, its instruction to the jury puts that doubt to rest. Before counsel's opening statement, the court told the jury that

> the State intends to offer evidence which they say includes things that the defendant either said or wrote, and those things include the N word. Now, you know, people find that offensive for good reason, but the defendant is not charged with using that word. He is charged with certain crimes. You should consider whether he committed the crimes, and not be influenced by the fact that he used the N word, and let that be the basis of you determination of whether he is guilty or not. So I guess what I'm saying is don't be influenced by that fact in deciding the case.[62]

The court's admonition that the jury "should not be influenced by the fact that [Jewell] used the N word" undermines the State's suggestions that the court found that the racial epithet was of significant probative value, much less a value that substantially outweighed the danger of unfair prejudice.

That the evidence had little or no probative value came into clearer focus during this appeal. Recall that, when the trial court was considering Jewell's pretrial objection, the prosecutor told the court that "[w]hen [the racial epithet] is just a gratuitous slur directed at the victim, the State has redacted that out."[63] But the State

---

[62] *Id.* at A52.
[63] *Id.* at A41.

acknowledged that, if the epithet was "part of the threat," it was not redacted.[64] The State repeated this representation in its answering brief in this Court. Upon further inquiry, the representation did not hold up.

When questions arose during argument before a three-Justice panel regarding the scope of the State's redactions, the panel requested supplemental briefing and requested *en banc* consideration of the appeal. The Court asked the State to identify with particularity in its supplemental brief the communications that formed the basis of the terroristic threatening counts in the indictment. Not one of the identified communications contained the unredacted N-word.[65] It follows that, contrary to the State's representation, the jury's exposure to Jewell's use of the N-word was exclusively through the State's introduction of statements extraneous to the threats.

In sum, it is beyond reasonable dispute that the trial court did not conduct the required balancing exercise under D.R.E. 403. That standing alone constitutes an abuse of discretion. It is equally clear to us that the challenged evidence possessed marginal, if any, probative value as to the charged offenses. The admission of that evidence was error. We turn now to the more difficult question: what is the effect of that error on Jewell's convictions?

---

[64] *Id.* Notably, the prosecutor then quoted one of the purported threats from which the epithet was not redacted. But when the State was asked by this Court to identify the threatening language that constituted the threats alleged in the terroristic threatening charges, it did not identify the passage quoted by the prosecutor to the trial court. *See* State's Am. Supp. Opening Br.

[65] *See* State's Am. Supp. Opening Br.

(iii)

The State contends that, if the Superior Court erroneously admitted into evidence Jewell's text messages and telephone call recordings without redacting the superfluous racial epithets, the error was harmless beyond a reasonable doubt. This contention is grounded in what the State describes as the "overwhelming evidence to sustain Jewell's convictions, despite the introduction of the racial epithets."[66] Jewell responds, citing our statement in *Weddington*, that "the right to a fair trial that is free of improper racial implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error."[67] He urges us to forgo harmless-error analysis altogether. Jewell contends alternatively that, should we review the harm caused by the error, we should conclude that the error was not harmless beyond a reasonable doubt.

At first glance, one might surmise that, as Jewell suggests, *Weddington* provides a definitive answer to the question before us: Its statement, read in isolation from *Weddington*'s factual context and without consulting our constitutional harmless-error jurisprudence, arguably supports the view that harmless-error analysis is precluded here. In our view, however, a careful perusal of the relevant cases, decided both before and after *Weddington* reveals otherwise.

---

[66] Answering Br. at 15.

[67] Opening Br. at 12 n.14 (quoting *Weddington*, 545 A.2d at 614–15).

Appellate courts have wrestled with "that most pervasive and elusive of all problems . . . , the riddle of harmless error"[68] for decades. Indeed, the esteemed Dean Wigmore traced its history to an 1835 decision by the English Court of the Exchequer in *Crease v. Barrett*.[69] Fortunately, we are not concerned here with the historical development of the doctrine but with its current status and application to the facts of this case. For that, we find our starting point in the United States Supreme Court's 1967 decision in *Chapman v. California*.[70]

In *Chapman*, the petitioners' state-court convictions for robbery, kidnapping, and murder were tainted by the prosecution's comments upon their decision not to testify at trial—a tactic then permitted by California's constitution. While the petitioner's appeal to the California Supreme Court was pending, the United States Supreme Court decided *Griffin v. California*,[71] holding that California's constitutional provision and practice violated criminal defendants' Fifth Amendment rights under the United States Constitution, which were made applicable to the states by the Fourteenth Amendment. In the *Chapman*'s state-court appeal, the California Supreme Court admitted that the petitioners' federal constitutional rights had been violated, but affirmed their convictions under the

---

[68] Roger J. Traynor, *The Riddle of Harmless Error* 4 (1970).
[69] *Id*. (citing 1 Wigmore on Evidence § 21 (3d ed. 1940) and *Crease v. Barrett*, 149 Eng. Rep. 1353 (Ex. 1835)).
[70] 386 U.S. 18 (1967).
[71] 380 U.S. 609 (1965).

California state constitution's harmless error-provision, which allowed for reversal only when an error resulted in a miscarriage of justice.[72]  The United States Supreme Court granted a writ of certiorari and framed two questions for decision—whether there can ever be harmless constitutional error and whether the error in the petitioners' case was harmless.  Only the first of these questions concerns us here.

Chapman and her co-petitioner urged the Court to adopt an "automatic reversal" rule under which "federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful."[73]  The Court rejected the petitioners' proposed rule, noting that the existing state and federal harmless-error rules "serve[d] a very useful purpose insofar as they block setting aside convictions for small defects or defects that have little, if any, likelihood of having changed the result of the trial."[74]  The Court recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . ."[75]  But the Court rejected the notion that all constitutional violations automatically require reversal.  In the passage that is most relevant here, Justice Black, writing for the majority, explained:

> Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.  It is for

---

[72] *See People v. Teale*, 404 P.2d 209, 220 (Cal. 1965).
[73] *Chapman*, 386 U.S. at 21–22.
[74] *Id.* at 22.
[75] *Id.* at 23.

that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. State of Connecticut* about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.[76]

The United States Supreme Court confirmed its commitment to the rule adopted in *Chapman* in *Delaware v. Van Arsdall*.[77] In that case, the Supreme Court vacated this Court's opinion, which had reversed Van Arsdall's murder conviction on the ground that the trial court had violated his Sixth Amendment confrontation rights when the court prohibited his counsel from exploring a prosecution witness's bias on cross-examination. This Court had concluded that "where the defendant was subjected to a blanket prohibition against exploring potential bias through cross-examination, the trial court committed a *per se error*. Consequently, the actual prejudicial impact of such an error is not examined and reversal is mandated."[78] On appeal, the United States Supreme Court found Van Arsdall's defense of this Court's application of what amounted to an "automatic reversal rule" unconvincing.[79] For

---

[76] *Id.* at 24 (italics added).
[77] 475 U.S. 673 (1986).
[78] *Van Arsdall v. State*, 486 A.2d 1, 7 (Del. 1984) ("*Van Arsdall I*") (emphasis added).
[79] *Delaware v. Van Arsdall*, 475 U.S. at 680.

the Court, "the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case."[80] Consequently, the Court vacated our decision and remanded so that this Court could determine whether the Confrontation Clause error in Van Arsdall's trial was harmless beyond a reasonable doubt.

In its opinion, the *Van Arsdall* Court stressed that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."[81] The Court noted further that "[s]ince *Chapman*, [the Court had] repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."[82]

On remand, this Court provided guidance, albeit limited, as to what type of constitutional error would fall within the "limited category" mentioned in *Delaware v. Van Arsdall*; that is, those that should be deemed per se harmful:

> Constitutional errors which warrant automatic reversal are of such a magnitude that they "either abort[ ] the basic trial process, *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (use of coerced confession), or den[y] it altogether, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased adjudicator)." *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3106, n. 6, 92 L.Ed.2d 460 (1986). A confession, for example, is so central to the

---

[80] *Id*. at 682.
[81] *Id*. at 681.
[82] *Id.*

32

ultimate question of guilt or innocence that the admission of an unconstitutionally obtained confession invariably denies the defendant his right to a fair trial. In contrast, the impact of bias cross-examination varies according to the factors identified above, and in certain circumstances may have no effect on the judgment.[83]

*Weddington*, discussed at length above, came around not long after this Court decided *Van Arsdall II*. The Court acknowledged *Chapman*'s "harmless error beyond a reasonable doubt" standard and noted that the State agreed that the error did not meet that standard. Despite this concession, the Court independently assessed the extent of the prejudice caused by the prosecution's gratuitous, racially charged question and concluded that "it had the potential to affect the outcome of the trial."[84] Framed in the language of *Chapman*, the Court concluded that it could not "say beyond a reasonable doubt that the improper question did not contribute to Weddington's convictions."[85] But the Court, as previously noted, emphasized that that was not the basis of its holding that Weddington's conviction should be reversed. Instead, the Court made it clear that the courts of this State will not tolerate the race-based tactic Weddington's prosecutor employed:

> In our opinion, the right to a fair trial that is free of improper racial implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error. . . . Accordingly, we find that the present case falls into the category of constitutional violations to which, as *Chapman* recognizes, the harmless error rule does not apply. . . . We also hold, as a matter of

---

[83] *Van Arsdall v. State*, 524 A.2d 3, 8–9 (Del. 1987) ("*Van Arsdall II*").
[84] *Weddington*, 545 A.2d at 614.
[85] *Id.*

Delaware law, that the improper injection of race as an issue into a criminal proceeding violates the right of due process which is guaranteed to all defendants in a criminal case under the Constitution of this State.[86]

Here, Jewell seizes upon this passage, contending that we may not review the Superior Court's error for harmlessness. But our review of post-*Weddington* cases dealing with the erroneous admission of racially charged evidence leads us to conclude otherwise.

Four years after *Weddington*, this Court decided *Dawson v. State*.[87] In *Dawson,* our Court affirmed on appeal the defendant's convictions for four counts of first-degree murder and related crimes and death sentence. On certiorari review, the United States Supreme Court held that the United States Constitution's First and Fourteenth Amendments prohibited the introduction in Dawson's capital sentencing hearing "of the fact that he was a member of an organization known as the Aryan Brotherhood, where the evidence ha[d] no relevance to the issues being decided in the proceedings."[88] The Supreme Court vacated this Court's judgment affirming Dawson's convictions and death sentence and remanded for consideration of "[t]he question whether the wrongful admission of the Aryan Brotherhood evidence was

---

[86] *Id.* at 614–15 (citations and footnotes omitted).

[87] 608 A.2d 1201 (Del. 1992).

[88] *Dawson v. Delaware*, 503 U.S. 159, 160 (1992). Before Dawson's penalty-phase hearing began, the parties stipulated that "[t]he Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id.* at 162.

34

harmless error . . . ."[89]  On remand, this Court understood the United States Supreme

Court's decision to have mandated "adher[ence] to the teachings of *Chapman* and

its progeny."[90]  This required the prosecution to demonstrate, beyond a reasonable

doubt, that "the error complained of did not contribute to the verdict obtained."[91]

Our conclusion that the State did not successfully carry that burden and its grounding

in the State's concession as to the purpose of the Aryan Brotherhood evidence was

neatly summarized:

> Given the United States Supreme Court's characterization of the Aryan Brotherhood evidence presented by the State, and the State's acknowledgement that the purpose of presenting that evidence was to weave Dawson's "embrace of the Aryan Brotherhood into a central theme that Dawson had an incorrigible character with his entire life showing repeated decisions to reject any redeeming paths," it is impossible for this Court to conclude the State has demonstrated, beyond a reasonable doubt, that the Superior Court's error in admitting the evidence about the Aryan Brotherhood did not contribute to the death sentences obtained by the State.[92]

Dawson's recognition that the wrongful admission of racially charged

evidence can, under appropriate circumstances, be subject to harmless-error analysis

is borne out by later decisions from this Court—*Floudiotis* and *Pierce*, both

discussed earlier.

---

[89] *Id.* at 168–69.
[90] *Dawson v. State*, 608 A.2d at 1205.
[91] *Id.* at 1204 (quoting *Satterwhite v. Texas*, 486 U.S. 249, 258–59 (1988)).
[92] *Id.* at 1205.

35

In *Floudiotis*—the case involving an offensively racist comment and photos and tattoos suggesting that one defendant was a white supremacist—this Court, having ruled the evidence out of bounds—conducted a harmless-error analysis. But because the defendants' convictions were reversed on other grounds, we did not decide if the improper admission of the evidence was reversible error.[93] But in *Pierce*, we took that additional step. Recognizing that "evidentiary errors with constitutional implications may be sustained if the error is harmless beyond a reasonable doubt,"[94] we concluded, after reviewing the wealth of evidence incriminating Pierce, that "the admission into evidence of Pierce's letters without redacting a racial epithet and a religious reference was harmless error beyond a reasonable doubt."[95] *Dawson*, *Floudiotis*, and *Pierce* all instruct—and we hold—that the admission of racially charged evidence is not per se reversible error but is subject to constitutional harmless error review.

But what of *Weddington*? Does our adoption of this approach, flirted with in *Floudiotis* and unreservedly taken in *Dawson* and *Pierce*, undermine *Weddington*'s holding that the improper injection of race "can never be treated as harmless error"?[96] We think not: *Weddington*, in our view, addressed an instance of

---

[93] 726 A.2d at 1207.
[94] *Pierce*, 2007 WL 3301027, at *4 (internal quotations omitted).
[95] *Id.*
[96] *Weddington*, 545 A.2d at 615.

36

prosecutorial misconduct for which the State later apologized and confessed error. The prosecutor's injection of the race issue was factually baseless and it appears to have been designed to inflame the jury; moreover, it literally "came out of nowhere" while the defendant was testifying. That tactic, which we described in *Zebroski* as a "deliberate attempt[] to create racial bias,"[97] stands in sharp contrast to what happened here where the prosecutor offered the evidence with advance notice and a colorable, if not ultimately persuasive, claim that it was relevant to the crimes charged. In short, this is not the type of "improper injection of race" that inspired *Weddington*'s per se rule.

(iv)

We turn then to consider whether the trial court's erroneous admission of unredacted recordings of telephone conversations and text messages was harmless error beyond a reasonable doubt. Under the *Chapman* test, the admission of evidence in violation of a constitutional right can be deemed harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to other verdict obtained."[98] And the burden is on the beneficiary—here, the State—to show that the error was harmless.[99]

---

[97] *Zebroski*, 715 A.2d at 79.
[98] 386 U.S. at 24.
[99] *Id.*

37

The United States Supreme Court has dilated on the *Chapman* test, specifically, on what it means to say that an error "contributed" to a verdict:

> To say that an error did not 'contribute' to the ensuing verdict is not, of course to say that the jury was totally unaware of that feature of the trial later held to have been erroneous . . . ; [it is], rather, to find the error unimportant in relation to everything else the jury considered on this issue in question, as revealed in the record.[100]

Consistently with that guidance, this Court has observed that, when undertaking constitutional harmless-error review, we "'must weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error' may have affected the judgment."[101]

Having reviewed the record in its entirety, we conclude beyond a reasonable doubt that the unredacted evidence did not contribute to the verdict in Jewell's case. The evidence, which consisted of the unchallenged telephone recordings and text messages of the very communications that were the offenses themselves and Andrea Johnson's testimony, was crushingly incriminating. Because the substance of Jewell's threats was beyond dispute, his argument to the jury was limited to pleading for sympathy and pointing his finger at the victim for tolerating Jewell's menacing

---

[100] *Yates v. Evatt*, 500 U.S. 391, 403 (1991).
[101] *Williams v. State*, 141 A.3d 1019, 1035 (Del. 2016) (quoting *Van Arsdall II*, 524 A.2d at 11). This review should be distinguished from a review of the untainted evidence to determine whether it is merely sufficient to sustain the judgment.

diatribes.[102]  Predictably, this defense—such as it was—failed.  Likewise, his bid for a reversal on the grounds that the admission of his racist comments was not harmless beyond a reasonable doubt fails.

B

Until now, we have focused on the 25 counts of terroristic threatening charged in the indictment, but Jewell was also charged with and convicted of a single count of stalking.  More specifically, under Count I of the indictment he was charged with

> **STALKING** in violation of Title 11, Section 1312 of the Delaware Code.
>
> DAVID JEWELL, on or between the 1st day of February 2021 and the 28th day of September 2021 . . . did knowingly engage in a course of conduct directed at Andrea Jordan, and such conduct would cause a reasonable person to fear physical injury to herself or that of another person, or suffer other significant mental anguish . . . and the course of conduct includes a threat of death [or] serious physical injury to the victim, or to another person.[103]

Jewell claims that the Superior Court erred by failing to inform the jury of a material element of his stalking charge.  He claims that the Superior Court should have informed the jury that, because the stalking charge was predicated on Jewell's speech, it was required to find that Jewell had the subjective intent to threaten another individual.  Though it does not contain one, Jewell asks us to read a

---

[102] Indeed, the telephone recordings and text messages of the actual threats shorn of the extraneous racist slurs spoke so convincingly for themselves, it is reasonable to ask why the prosecution felt the need to offer anything but the threats.

[103] App. to Opening Br. at A5.

39

subjective-intent requirement into 11 *Del. C.* § 1312. A construction of the statute that does not impute a subjective intent element, Jewell claims, would criminalize protected speech in violation of the First Amendment to the United States Constitution. Because Jewell did not challenge the jury instruction concerning his stalking charge in the Superior Court, we review for plain error.[104] Though Jewell's First Amendment argument holds water, his conviction for stalking survives plain error review.

To amount to plain error, an error in the trial process "must be so clearly prejudicial as to substantial rights as to jeopardize the fairness and integrity of the trial process."[105] "This means that it must have affected the outcome of the trial."[106] "Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[107]

Under 11 *Del. C.* § 1312:

(a) A person is guilty of stalking when the person knowingly engages in a course of conduct directed at a specific person and that conduct would cause a reasonable person to:

---

[104] Opening Br. at 13 (citing *Hastings v. State*, 289 A.3d 1264, 1267 (Del. 2023) and Supr. Ct. R. 8).
[105] *Hastings*, 289 A.3d at 1270 (quoting *Lowther v. State*, 104 A.3d 840, 845 (Del. 2014)).
[106] *Id.* (quoting *Buckham v. State*, 185 A.3d 1, 19–20 (Del. 2018)).
[107] *Turner v. State*, 5 A.3d 612, 615 (Del. 2010).

(1) Fear physical injury to himself or herself or that of another person; or

(2) Suffer other significant mental anguish or distress that may, but does not necessarily, require medical or other professional treatment or counseling.[108]

A "course of conduct" is defined as:

3 or more separate incidents, including, but not limited to, acts in which the person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveys, threatens, or communicates to or about another, or interferes with, jeopardizes, damages, or disrupts another's daily activities, property, employment, business, career, education, or medical care.[109]

Our stalking statute, by defining "course of conduct" to include situations where an individual repeatedly "threatens" a victim or "communicates" with a victim clearly provides for the criminalization of some speech. "The 'First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed.'"[110] But the First Amendment "does not protect classes of speech 'which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'"[111] "True threats" are one such class of proscribable speech.[112]

---

[108] 11 *Del. C.* § 1312.
[109] *Id.* at (e)(1).
[110] *Andrews v. State*, 930 A.2d 846, 850 (Del. 2007) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992)).
[111] *Id.* (quoting *R.A.V.*, 505 U.S. at 382–83).
[112] *Virginia v. Black*, 538 U.S. 343, 359 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)).

In *Virginia v. Black*, the Supreme Court of the United States defined "true threats" as statements in which the speaker means to communicate a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."[113] "[A] prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur."[114] Until recently, federal circuit courts were split over the proper test for determining whether speech may be criminalized as a true threat under *Black*. Some courts had adopted a "reasonable listener" or "reasonable speaker" test, objective standards by which to evaluate the content of a threat, and found that *Black* does not render such tests impermissible.[115] Other courts had found that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."[116]

The United States Supreme Court resolved this split of authority in *Counterman v. Colorado*.[117] In *Counterman*, the Court reversed a conviction under Colorado's stalking statute. Colorado's stalking statute made it unlawful to

---

[113] *Id.*

[114] *Id.* at 359–60.

[115] *See Andrews*, 930 A.2d at 851–52.

[116] *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005). *See also United States v. Heineman*, 767 F.3d 970, 978 (10th Cir. 2014) ("We read *Black* as establishing that a defendant can be constitutionally convicted of making a true threat only if the defendant *intended* the recipient of the threat to feel threatened.") (emphasis in original).

[117] 600 U.S. 66 (2023).

"[r]epeatedly . . . make[ ] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress."[118] In *Counterman*, the defendant had sent hundreds of Facebook messages to a local singer whom he had never met, and many of the messages expressed anger at and wished harm upon her.[119] The Court reversed Counterman's conviction because under the First Amendment the state was required to prove, but the jury was not asked to find, that the defendant had a "subjective intent to threaten" the singer.[120]

The Court reasoned that the First Amendment demands a subjective mental-state requirement to convict an individual under speech classified as a true threat to avoid a potential chilling effect on speech.[121] If "[a] speaker [is] . . . unsure about the side of a line on which his speech falls[,]" he might engage in "'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms."[122] "[A]n important tool to prevent that outcome—to stop people from steering 'wide[] of the unlawful zone'—is to condition liability on the State's showing of a culpable mental state."[123] The Court noted that such a requirement may shield some otherwise proscribable speech when the state is unable

---

[118] *Id.* at 70 (quoting *Colo. Rev. Stat.* § 18-3-602(1)(c) (2022)).
[119] *Id.*
[120] *Id.* at 72–73.
[121] *Id.* at 75.
[122] *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).
[123] *Id.*

to prove what a defendant was thinking, but the value of such a requirement, according to the Court, is the reduced likelihood of chilling constitutionally protected speech.[124]

We have construed other statutes that criminalize speech as "true threats" in this state to require the State to show that a defendant had a subjective intent to threaten. In *Andrews v. State*,[125] we addressed the proper construction of our terroristic threatening statute. In relevant part, our terroristic threatening statute criminalizes speech consisting of a "threat[] to commit a crime likely to result in death or serious injury to person or property."[126] Though the statute itself does not contain a *mens rea* requirement, 11 *Del. C.* § 251(b) provides that "[w]hen the state of mind sufficient to establish an element of an offense to not prescribed by law," the State must prove that the defendant acted intentionally, knowingly, or recklessly.[127] We held that a construction of the statute that would require the State only to prove "'a mere intent to utter the words' . . . would be unconstitutionally overbroad because it would place within the statute's ambit speech that is otherwise constitutionally protected."[128] Instead, we found that our terroristic threatening statute requires "that the State prove not only that the defendant uttered words that

---

[124] *Id.*
[125] 930 A.2d 846 (Del. 2007).
[126] 11 Del. C. § 621(a)(1).
[127] 11 *Del. C.* § 251(b).
[128] *Andrews*, 930 A.2d at 854.

facially threaten serious physical injury or death but also that in uttering them, the defendant intended to threaten the victim."[129]

Turning to the proper construction of our stalking statute, 11 *Del. C.* § 1312, "[t]his Court has a duty to read statutory language so as to avoid constitutional questionability and patent absurdity and to give language its reasonable and suitable meaning."[130] In light of *Counterman* and *Andrews*, the proper construction of 11 *Del. C.* § 1312 is clear. When a stalking charge is predicated on speech, the State must prove that, through such speech, the defendant had either the subjective intent to cause the sort of fear or mental anguish contemplated by the statute, or knowledge that their speech would cause a reasonable person to suffer such fear or mental anguish. As Jewell points out, Section 1312 is substantially similar to the statute at issue in *Counterman*.[131] Reading the language in Section 1312 to avoid "constitutional questionability[,]"[132] requires us to read it in harmony with the United States Supreme Court's pronouncements concerning the requirements of the First Amendment. A construction of Section 1312 that permits a speech-based stalking conviction under Section 1312 without requiring the state to prove the defendant's subjective intent or knowledge would run afoul of *Counterman*'s

---

[129] *Id.*
[130] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008) (quoting *State v. Sailer*, 684 A.2d 1247, 1250 (Del. Super. Ct. 1995)) (internal quotation marks omitted).
[131] Opening Br. at 15.
[132] *Hoover*, 958 A.2d at 821.

guidance. Given the "fundamental precept"[133] that "enactments of the Delaware General Assembly are presumed to be constitutional[,]"[134] a construction of Section 1312 that would leave it at odds with a defendant's First Amendment protections cannot be correct.

Requiring the State to prove subjective intent in stalking cases based on speech also harmonizes what the State must prove under Section 1312 with our interpretation of our terroristic threatening statute, 11 *Del. C.* § 621. Our construction of that statute "exempts statements that were not true threats by requiring that the speaker intend to actually make a threat, not merely intend to utter the words."[135]

But unlike our construction of the terroristic threatening statute, which was informed by 11 *Del. C.* § 251(b) because the statute provides no *mens rea*, here we turn to 11 *Del. C.* § 252. Section 252 provides that "[w]hen a statute defining an offense prescribes the state of mind that is sufficient for the commission of the offense, without distinguishing among the elements thereof, the provision shall apply to all the elements of the offense, unless a contrary legislative purpose plainly

---

[133] *Albence v. Higgin*, 295 A.3d 1065, 1088 (Del. 2022) (evaluating the constitutionality of a statute under the Delaware constitution). This principle applies to both the United States and Delaware Constitutions. *See Hoover*, 958 A.2d at 821 (applying the same precept to an evaluation of a statute under the United States constitution).

[134] *Id.*

[135] *Lowther*, 104 A.3d at 845.

appears."[136]  Section 1312 states that a defendant must "knowingly" engage in a course of conduct.  Accordingly, we find that Section 1312 requires, when its violation is based on speech, that the state prove both that a defendant knowingly "engaged in a course of conduct directed at a specific person" and knew that such "conduct would cause a reasonable person" to fear physical injury or suffer significant mental anguish as described by Section 1312(a)(1) and (a)(2).[137]

The jury was not instructed to consider, specifically as an element of Jewell's stalking charge, whether Jewell knew that his course of conduct that would cause a reasonable person to fear physical injury to themselves or another or suffer other significant mental anguish.[138]  This omission does not, however, rise to the level of plain error.  Numerous events that constitute "threats" and "communications" sufficient to establish the "course of conduct" alleged in Jewell's stalking charge were separately charged under our terroristic threatening statute.  As discussed

---

[136] 11 *Del. C.* § 252.

[137] We note that the Superior Court has in another case come to an opposite conclusion concerning the construction of Section 1312.  *See State v. Reeves*, 316 A.3d 408, 427–428 (Del. Super. Ct. 2024).  We disagree that a reference to a "reasonable person" by the General Assembly imputes a *mens rea* of negligence to Section 1312's result element. Our constitutional avoidance precedent, see nn.130–34 *supra*, also dictates that we avoid such a construction.  Nor does Section 1312(h) foreclose our conclusion.  Subsection (h) merely states that it is not a defense to stalking that an alleged victim did not, by some means, give the defendant "actual notice" that the defendant's conduct was unwanted.  And by providing that it shall not be a defense to stalking that the perpetrator did not "intend to cause the victim fear of other emotional distress[,]" Subsection (h) only forecloses constructions of the statute that would apply a *mens rea* of "intentionally" to Section 1312's result element.  Proving that a defendant acted intentionally, of course, will also support a conviction for a crime under which the required mental state is "knowingly."  *See* 11 *Del. C.* § 253.

[138] App. to Opening Br. at A456–58.

above, for a defendant to be convicted under that statute, the state must prove that a defendant had a culpable subjective mental state. The jury was properly instructed to find as such:

> The indictment charges the defendant with 25 counts of terroristic threatening. In order to find the defendant guilty of terroristic threatening, you must find that the state has proven the following two elements beyond a reasonable doubt: First, the defendant threatened to commit a crime likely to result in death or serious injury to Andrea Jordan and/or another person; and second, the defendant acted . . . intentionally or knowingly.
>
> "Intentionally" means it was the defendant's conscious objective or purpose to threaten to commit a crime likely to result in death or serious injury or serious damage to property.
>
> "Knowingly" means the defendant was aware the defendant was threatening to commit a crime likely to result in serious injury or serious damage to property.[139]

The jury returned guilty verdicts on all 25 terroristic threatening charges. We are hard pressed to see how—even if the jury had been instructed to consider Jewell's subjective intent as part of his stalking charge—the jury could have found subjective intent or knowledge as to 25 counts of terroristic threatening and simultaneously been unable to do so for just three instances of "threatening" or "communicating" needed to constitute a "course of conduct" under our stalking statute. And it is clear—and Jewell does not argue otherwise—that the content of the threats underpinning the 25 terroristic threatening convictions would "cause a

---

[139] *Id.* at A460.

reasonable person to fear physical injury to himself or herself or that of another person" or otherwise cause mental anguish as described by Section 1312.[140] It is also indisputable, given the terroristic threatening convictions, that the course of conduct underlying Jewell's stalking conviction included a "threat of death or threat of serious physical injury to the victim, or to another person."[141]

Because the jury in this case was required to evaluate Jewell's mental state as to over two dozen offenses that could also establish a course of conduct sufficient to support a stalking conviction—and convicted him on each one—we cannot say that the incomplete stalking instruction changed the outcome of Jewell's trial or otherwise jeopardized its fairness or integrity. Accordingly, we affirm Jewell's conviction for stalking.

## C

Jewell also contends that he was entitled to a specific unanimity instruction for ten of his terroristic threatening charges, Counts III, V, IX, X, XI, XII, XIV, XV, XX and XXIV. These charges allege that Jewell "did threaten to commit a crime likely to result in death or serious physical injury to *another person*" or to "Andrea Jordan *and/or another person*."[142] Jewell claims that a specific unanimity instruction was required because, for these counts, the indictment enabled the jury

---

[140] 11 *Del. C.* § 1312(a)(1)–(2).
[141] *Id.* at (c)(4).
[142] App. to Opening Br. at A22–29 (emphasis added).

to convict him on multiple distinct theories of liability and the state provided evidence on multiple theories of liability. Because Jewell did not request a specific unanimity instruction at trial, we review this claim for plain error.[143]

In *Probst v. State*, we held that "[i]n the routine case, a general unanimity instruction is sufficient to [e]nsure that a jury is unanimous on the factual basis for a conviction."[144] We have stated that "*Probst* is a narrow exception to the rule that a general unanimity instruction is usually sufficient."[145] And this general rule holds "even where an indictment alleges numerous factual bases for criminal liability."[146] But "the general rule does not apply 'where there are factors in a case which create the potential that the jury will be confused.'"[147] "A more specific unanimity instruction is required "if (1) a jury is instructed that the commission of any one of several alternative actions would subject the defendant to criminal liability, (2) the actions are conceptually different and (3) the state has presented evidence on each of the alternatives."[148]

For the counts in the indictment that Jewell identifies, the *Probst* factors are met. The jury instructions for Jewell's terroristic threatening charges included

---

[143] *See* nn.104–07 and accompanying text, *supra*.

[144] 547 A.2d 114, 120 (Del. 1988).

[145] *Hale v. State*, 2024 WL 5116860, at *3 (Del. Dec. 16, 2024).

[146] *United States v. Smukler*, 991 F.3d 472, 492 (3d. Cir. 2021) (quoting *United States v. Gonzalez*, 905 F.3d 165, 184 (3d Cir. 2018)).

[147] *Dougherty v. State*, 21 A.3d 1, 3–4 (Del. 2011) (quoting *Probst*, 547 A.2d at 120).

[148] *Probst*, 547 A.2d at 120 (quoting *State v. Edwards*, 524 A.2d 648, 653 (Conn. App. Ct. 1987)) (internal quotation marks omitted).

disjunctive "and/or" language concerning the identity of the victim, enabling the jury to convict on multiple theories of liability.[149] The alleged actions are also conceptually different—they consist of two or more separate threats against two or more different people. And as to each count that Jewell has identified, the state presented evidence concerning each alternative.[150]

Critically, however, Jewell did not request a specific unanimity-instruction at trial.[151] Therefore we review this claim for plain error. Upon review of the record, the evidence introduced by the State under any theory of liability, whether a threat aimed at Jordan or at "another person," was highly persuasive, if not overwhelming. Given the compelling nature of the evidence presented against Jewell as to all possible theories of liability, we cannot find that the error complained of was so clearly prejudicial to Jewell's substantial rights as to jeopardize the fairness and integrity of the trial process.[152]

---

[149] App. to Opening Br. at A460.

[150] The State presented recordings of entire phone calls in which Jewell threatened multiple individuals. It also presented a log of Jewell's text messages to Jordan over the period from March 2021 to September 2021. App. to Opening Br. at A482–685. The text messages show Jewell threatening multiple individuals on the dates alleged in each of the counts Jewell has identified. The messages were admitted into evidence and accordingly made available to the jury during their deliberations.

[151] Opening Br. at 17.

[152] *Dougherty*, 21 A.3d at 7.

D

Jewell next contends that the similarity in the charged conduct under two pairs of terroristic-threatening counts in the operative indictment—Counts VII and VIII and Counts IX and XI—violates his double-jeopardy rights. He cites neither the constitutional provision protecting defendants against double jeopardy nor any cases supporting his specific claim, which appears to be predicated solely on the fact that the crimes alleged in the two pairs of terroristic-threatening counts occurred on the same date and involve "identical [] or entirely overlapping conduct."[153] Jewell did not raise this issue in the Superior Court; hence, we now consider his argument under the plan-error standard of review described above.

The constitutional principle of double jeopardy is "fundamental to our criminal justice system," and both the United States Constitution and the Delaware Constitution contain a Double Jeopardy Clause.[154] The Double Jeopardy Clause in both constitutions prohibits a person from being "twice put in jeopardy of life or limb" for the same criminal offense.[155] An essential purpose of the Double Jeopardy Clause is to protect a person "against multiple punishments for the same offense."[156]

---

[153] Opening Br. at 21.
[154] *Martin v. State*, 308 A.3d 1121, 1132 (Del. 2023) (quoting *Blake v. State*, 65 A.3d 557, 561 (Del. 2013)). *See also* U.S. Const. amend. V; Del. Const. art. I, § 8.
[155] U.S. Const. amend. V; Del. Const. art. I, § 8.
[156] *White v. State*, 243 A.3d 381, 396 (Del. 2020) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

Jewell argues that Count VII, which charged him with terroristic threatening on May 27, 2021, for threatening Andrea Jordan, is "entirely subsumed by Count VIII," which charged him with threatening "another person" on May 27, 2021.[157] He also argues that the second pair of convictions—Counts IX and XI—violates the Double Jeopardy Clause because, under both counts, he is charged with threatening "another person" on May 29, 2021.[158] The State argues that neither pair of convictions is multiplicitous because each count relates to a separate threat, even if those threats were made on the same day or threatened the same person. A review of the evidentiary record supports the State's position.

In support of Counts VII and VIII, the State introduced evidence at trial demonstrating that Jewell made threats against two different individuals on May 27. More specifically, the State introduced and played for the jury a recorded phone call from Jewell to Jordan on May 27, 2021. During the phone call, Jewell very clearly threatened Jordan. He told her, "Andrea . . . when I come home, I am going down to Virginia and I'm going to prove a point, and *I'm gonna show you how much of a woman beater I am.*"[159] During the same phone call, Jewell also threatened Jordan's boyfriend, Drew. Jewell said, "Listen, *I'm gonna to f*** [Drew] up when I get out.*

---

[157] Opening Br. at 22. *See also* App. to Opening Br. at A23.
[158] Opening Br. at 21. *See also* App. to Opening Br. at A24.
[159] *See* State's Am. Supp. Opening Br. at 4 (citing App. to Opening Br. at A122 and State's Ex. 8 at 00:48 to 00:54) (emphasis added).

I'm telling you. You can pass the message to him . . . *I'm coming for blood* and I'm gonna prove a point."[160]  Because the evidence demonstrates that Jewell threatened harm to two different people on May 27, Counts VII and VIII do not violate the Double Jeopardy Clause.

As to Counts IX and XI, Jewell correctly notes that both counts charged him with terroristic threatening "on or about the 29th day of May . . . [for] threaten[ing] to commit a crime likely to result in death or serious physical injury to another person."[161]  The record shows that on May 29, Jewell levelled two threats—one by text message and the other in a phone conversation.

In the text message sent to Jordan at approximately 8:42 a.m. on May 29, 2021, Jewell warned Jordan, " . . . ur gonna end up regretting this, I promise you!!!! *I'm going to beat the shit out of your new man*.  Once I touchdown . . . take care . . . ."[162]  And during a recorded phone call between Jewell and Jordan that took place at approximately 10:13 a.m. on May 29, 2021, Jewell told Jordan, "*My sons and I will beat the f\*\*\* out of your new man*. . . . Me and Zach are in the best shape of our f\*\*\*ing life right now.  I'm going to cause you so many problems."[163]

---

[160] *Id.* (citing App. to Opening Br. at A122 and State's Ex. 8 at 01:00 to 01:06; 3:00 to 4:02) (emphasis added).
[161] *Id.* at A24.
[162] App. to Opening Br. at A632 (emphasis added).
[163] State's Am. Supp. Opening Br. at 5 (emphasis added).

That the purportedly multiplicitous charges related to separate threats would have been obvious to Jewell before trial as the State produced "[a]ll [p]rison calls . . . and [t]ext messages" in discovery.[164]  And Jewell could have also availed himself of a request for a bill of particulars under Superior Court Criminal Rule 7(f) but chose not to.

Given the clarity of the record, we are satisfied that the manner in which the State crafted the indictment did not subject Jewell to double jeopardy for the same offense.  We conclude further that, to the extent that the indictment did not on its face clearly describe the separate threats Jewell made on May 27 and May 29, 2021, such failure did not jeopardize the fairness and integrity of Jewell's trial.

E

Jewell's final argument is, from our perspective, a novel one.  He asserts that the evidence supporting his conviction under Count IV—one of the many terroristic threatening charges—was insufficient as a matter of law because the threat failed to identify by name the person whom Jewell threatened by name. The evidence at trial showed that, during a March 14 telephone conversation, Jewell warned Jordan:  "I know you're seeing someone  .  .  . I will beat the f***ing s*** out of them when I

---

[164] Letter from Brianna M. Millis, Deputy Attorney General to Michael Modica, Esq., *State v. Jewell*, ID No. 2109014213 (Del. Super. Ct. Nov. 2, 2022) (Dkt. 7).

come home . . . when I come home if there's a guy around my daughter, I will f***ing destroy him."[165]

Jewell did not move for a judgment of acquittal as to Count IV and acknowledges his claim is now subject to review for plain error. He contends that, because an element of terroristic threatening requires proof of a threat to commit a crime likely to result in death or serious injury to a "person" and because, under our Criminal Code, "'Person' means a human being who is born and is alive,"[166] the State's failure to prove that the March 14 threat was directed at a named "person" so defined is fatal to Count IV. According to Jewell, his conviction under Count IV is a due process violation that must be considered plain error.

Jewell cites no cases on point to support this claim, nor does he specify the nature of the alleged due process violation. We cannot discern any error, much less plain error, given Jewell's formulation of this argument. That he intended to threaten harm to another person—that is, the person "seeing" Jordan—is obvious. And he seemed quite certain that the person existed. In a word, this claim lacks merit.

III

We affirm the Superior Court's judgments of conviction.

---

[165] App. to Opening Br. at A729.
[166] 11 *Del. C.* § 222 (21).

56

**LEGROW, J. dissenting, joined by GRIFFITHS, J.:**

The improper injection of racial bias in a trial violates a defendant's constitutional right of due process.[167] Where, as here, the defendant's racist comments served no evidentiary purpose, were admitted after the State erroneously represented to the trial judge that all gratuitous references to the defendant's racial biases had been redacted, and the jury heard more than 140 instances of the defendant using the "N-word," I find it impossible to conclude beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the jury's verdict. I therefore respectfully dissent.

I agree with my colleagues in the Majority in nearly every respect regarding Jewell's arguments on appeal. The Majority opinion thoroughly discusses the Constitutional and evidentiary principles at issue when the State seeks to admit racially charged evidence in a criminal proceeding. Applying those principles, the Majority holds that the trial court abused its discretion in failing to weigh the challenged evidence under Rule 403. The Majority also concludes that the challenged evidence's probative value was marginal at best[168] and its admission therefore constituted error. I also agree with the Majority's conclusion that the wrongful admission of racially charged evidence can be subject to harmless-error

---

[167] *Floudiotis v. State*, 726 A.2d 1196, 1202 (Del. 1999); *see also Pierce v. State*, 937 A.2d 140, 2007 WL 3301027, at \*4 (Del. 2007) (TABLE); *Weddington v. State*, 545 A.2d 607, 613 (Del. 1988).

[168] In my view, there was no probative value.

review in appropriate circumstances.[169] I part ways with the Majority, however, and would reverse Jewell's convictions because (1) this is not an appropriate case for harmless-error review; and (2) even if a harmless-error analysis should apply, the State failed to meet its burden of proving that the trial court's error was harmless beyond a reasonable doubt.

I am reluctantly of the view that the State's use of Jewell's racist remarks was a deliberate attempt to improperly expose the jury to Jewell's abstract racist beliefs and create bias against him. The State represented to the trial court that it had redacted any use of racially charged language that was "gratuitous," and that the jury would hear only those uses of the N-word that were "part of the threat."[170] Inexplicably, at trial, the State removed nearly every redaction without advising the trial court or Jewell's counsel of that change. Even if the State's about-face was based on its understanding of the trial court's evidentiary ruling, it was incumbent on the State to be clear about its intention to admit the numerous instances of Jewell using the N-word in statements that did not form the basis of the criminal charges.[171]

As the Majority points out, in light of the actual threats contained in Jewell's statements, it is difficult to understand why the State felt the need to proffer the

---

[169] I also join the Majority's analysis of Jewell's claims on appeal that are unrelated to the racially charged language.

[170] App. to Opening Br. at A41–42.

[171] *See* App. to Opening Br. at A41 (State acknowledging that Jewell used the N-word "140-ish times" in text messages); video of Oral Argument, *Delaware Supreme Court*, at 17:24 (Sept. 18, 2024), https://vimeo.com/1010662080 (same).

racially charged evidence at all.[172] Given the strength of the State's case on its merits and the fact that the racist statements had nothing to do with the charged crimes, I am challenged to conclude that the State relied on the evidence for any reason other than to paint Jewell as a racist and inflame the jury's passions.[173]

As we held in *Weddington v. State*, when the State deliberately attempts to create racial bias against a defendant, it violates his "basic right to a 'fair trial that is free of improper racial implications.'"[174] There is nothing more fundamental to due process than the right to an impartial jury.[175] The admission of racial evidence proffered only to establish "a defendant's abstract beliefs or to create bias against him" clearly violates due process.[176] In the Majority's view, under *Weddington*, we do not review a claim for harmless error if the prosecution has improperly, intentionally, and baselessly injected race in a proceeding.[177] Because I believe that the record before us persuasively indicates that the evidence was admitted solely to inflame the jury's passions and served only to inject incendiary race-based language

---

[172] Majority Op. ("Op.") at 39, n.102.
[173] *See Floudiotis*, 726 A.2d at 1205 ("Such a depiction is irrelevant to the charged crime of assault on white victims, and merely serves to inflame the passions of the jury.").
[174] *Zebroski v. State*, 715 A.2d 75, 79 (Del. 1998) (quoting *Weddington*, 545 A.2d at 615).
[175] *Weddington*, 545 A.2d at 613.
[176] *Floudiotis*, 726 A.2d at 1202–03.
[177] Op. at 36–37.

into a trial that had nothing to do with race, this case is not meaningfully different from *Weddington*,[178] and I would not engage in harmless-error review.[179]

But even if the State's use of 140 instances of racially charged comments—unrelated to the threats at issue in the case—could be said to be an unintentional injection of racial bias into the trial, the State has not carried its burden of proving harmless error beyond a reasonable doubt.

Harmless error is a case-specific, fact-intensive analysis.[180] When the error complained of is constitutional in nature, we apply a "very exacting" test[181] that requires us to be convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[182] The focus is "not whether the legally admitted evidence was sufficient to support the [verdict],"[183] but whether there is "a reasonable possibility that the evidence complained of might have contributed to the conviction."[184]

---

[178] Although the Majority points out that, unlike *Weddington*, the State advised Jewell's counsel before trial of its intent to use this evidence, I take little comfort in that distinction given the State's failure to make the redactions that it advised the court and counsel would be made.

[179] To reiterate, I agree with the Majority that harmless-error review is appropriate in cases in which the evidence has some relevance but ultimately should have been excluded under Rule 403.

[180] *Capano v. State*, 781 A.2d 556, 598 (Del. 2001) (quoting *Dawson v. State*, 608 A.2d 1201, 1204 (1992)).

[181] Charles Alan Wright, et al., 3B Fed. Prac. & Proc. Crim. § 855 (4th ed.).

[182] *Chapman v. California*, 386 U.S. 18, 24 (1967).

[183] *Dawson*, 608 A.2d at 1204 (quoting *Satterwhite v. Texas,* 486 U.S. 249, 258–59 (1988)).

[184] *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963).

The State argues that the evidence against Jewell was overwhelming.[185] But it does not follow that there is no reasonable possibility that the evidence of Jewell's repulsive, racist views did not contribute to the jury's verdict as to any of the 27 counts. Although I agree with the Majority that the evidence against Jewell was strong, the defense presented evidence from which a jury could conclude that the State had not met its burden of proving that he acted with the requisite *mens rea* as to each count against him.[186]

Evaluating this case against the spectrum of cases in which we have considered whether a jury's exposure to racially charged evidence was harmless, the evidence at issue here falls convincingly at the reversible-error end of the continuum. In fact, the State has identified only one case—*Pierce v. State*—in which we held that the improper admission of evidence of a defendant's racial bias was harmless error.[187] *Pierce* involved the jury hearing "two words"—one racially charged and

---

[185] State's Answering Br. at 14–15. If the evidence was as overwhelming as the State contends, one wonders why the prosecutors felt the need to rely on inflammatory, irrelevant evidence.

[186] The defense presented evidence that over the nine-month period in which Jewell was charged with threatening and harassing Jordan, the two spoke on the phone 404 times, and Jordan had to actively accept each call. In the same time period, she also assisted him emotionally and financially. The State was required to prove that Jewell acted knowingly as to the effect that his words would have on a reasonable person, and Jewell's counsel argued to the jury that Jordan's behavior did not signal to Jewell that she felt fearful or threatened. *See* 11 *Del. C.* § 1312(a) (stalking); 11 *Del. C.* § 1311(a)(2) (harassment); 11 *Del. C.* § 621(a) (terroristic threatening); App. to Opening Br. at A440–44 (closing argument).

[187] In *Zebroski*, we affirmed the defendant's murder conviction when the jury heard evidence that included racially charged language because we concluded that the evidence was relevant to the issues involved in that case. 715 A.2d at 79–80. No harmless-error review was conducted.

61

one religiously charged.[188]   In contrast, in *Floudiotis v. State*, we held that the admission of racially charged evidence in the form of racist tattoos and t-shirts and one racist comment constituted reversible error.[189]  This case far outstrips *Floudiotis* both qualitatively and quantitatively and cannot be said to be on the same end of the spectrum as *Pierce.*

If some of the uses of the challenged evidence had been inextricably intertwined with the threats and admissible under Rule 403, it might be said that the additional instances were cumulative and therefore their admission was harmless beyond a reasonable doubt.  But this is not that case.  Although the State had compelling evidence, its improper reliance on 140 irrelevant instances of Jewell's use of the N-word cannot be said to have had no effect on the jury's verdict.  I therefore would reverse Jewell's convictions so that he could be tried without the improperly admitted evidence.

---

[188] *Pierce*, 2007 WL 3301027 at *4.
[189] *Floudiotis*, 726 A.2d at 1203–05.

# Appendix

| Count No. | Telephone or Text Record Reference | Description |
|---|---|---|
| III-2/28/21 | Telephone A113-14; State's Ex. 3 | "I will beat [Heather's] husbands head into the concrete when I get out . . . . I will make him swallow his teeth." |
| IV-3/14/21 | Telephone A116-18; State's Ex. 5 at 11:39-12:29 | "Who the f[**]k are you seeing, Andrea? Because I will f[*****]g beat the s[***] out of him when I get home. . . . Who is it? . . . . Well, I'm letting you know, when I come home, and there's a guy around my daughter, I will f[*****]g destroy him. And then the prosecutor would have me a reason to put me in jail for a long time. Then I'll give the f[*****]g c[***] a reason to put me in jail." |
| V-5/22/21 | Telephone A118-20; State's Ex. 6 at 2:20-2:38; 8:35-8:46 | "You wait until I get home, MFer. Watch me. I'm gonna make you regret some s[***]. . . .No, I'm gonna to go after Lisa; she's my first target. . . .Watch me. . . . You're going to put me through this agony. You're gonna make me come home and do a life sentence over you. You're gonna f[*****]g end up in a f[*****]g box, b[***]h. . . " |
| VI-5/25/21 | Telephone A12-22; State's Ex. 7 at 3:11 to 3:38 and 4:53-4:57 | "Listen, enjoy your life now because you're going to die when I get out, b[***]h. . . . you think it's a f*****]g joke . . . M[*****]f[****]r, listen, I got one more chance when I get out. You keep treating me like s[***], you keep treating me like s[***], and [A.J.] ain't gonna have no motherf[*****]g mom . . . . . Andrea, you're done. You have no clue what you just did. F[***] you and [A.J.]; you can both die." |
| VII—5/27/21 | Telephone A122; State's Ex. 8 at 00:48 to 00:54 | "Andrea, Drew and I are going to fight, when I come home, I'm going down Virginia and I'm gonna prove a point, and I'm gonna show you how much of a woman beater I am." |
| VIII-5/27/21 | Telephone A122-23; State's Ex. 8 at 1:00 to 1:06; 3:00 to 4:02 | "I'm going after Drew . . . I deserve a match, a fair fight with him and that's what I want." "Listen, I'm gonna to f[**]k him up when I get out. I'm telling you. You can pass that message to him, if you talk to him, and you can tell Lisa the same thing, I'm coming for blood and I'm gonna prove a point. . . . Andrea, you watch me. . . . But I tell you what, if I'm down there and Drew comes around, I will f[*****]g, I'm gonna show you . . . I don't care how big he is. . . . I got a point to prove." |

| | | |
|---|---|---|
| IX-5/29/21 | Telephone<br>A123; A131; State's<br>Ex. 9 at 3:41 to 4:03 | "You're lucky I'm in jail, you're lucky I'm in jail, man, you're lucky I'm in jail." Andrea responds, "I'm trying to talk to you. I don't want any problems." Jewell says, "You're gonna get 'em, you're gonna get 'em. My sons and I will beat the f[***] out of your new man. I already talked to Zack yesterday about that. Me and Zack are in the best shape of our f[*****]g life right now. I'm going to cause you so much problems." |
| X-5/28/21 | Text<br>A633 | "You're hillbilly's from Virginia [redacted word]. Zach and I are in the best shapes were gonna destroy your new man [redacted word]. You wanna war. . . . Your gonna get one! . . ." |
| XI-5/29/21 | Text<br>A632 | " . . . ur gonna end up regretting all this, I promise you!!!! I'm gonna beat the s*** out of your new man. Once I touchdown . . . take care . . . ." |
| XII-6/2/21 | Telephone<br>A132-34; State's Ex.<br>10 at 1:28 to 1:47; 6:30<br>to 6:52. 8:40 to 9:13;<br>10:24 to 11:10; 11:40<br>to 11:50; 12:27 to<br>12:41. | "I'm going to catch a life charge off of you when I get home. I'm afraid of what I'm going to do to you. . . . Not only am I coming after you, but I'm coming after Lisa because she's hooking you up with guys. And her husband, I'm gonna to f[**]k him up when I get out. . . . I'm coming after Lisa's husband. . . . Any MFer that's with you when I get out, I will destroy. You need to know that. . . . My mom's dead. I have nothing to live for anymore. You understand what I am saying to you? And a b[****]-a[**] PFA is not gonna keep me away. Bring the MFing dude around your house when I get out and watch what I will do. . . . Listen to me. You're gonna pay for this. . . . Watch. You're gonna pay. . . . . Andrea, I'm coming to Virginia when I get out. I'm coming for Lisa. Let her husband know, when you see him, tell him I'm gonna beat his fucking teeth down his throat. . . . Listen I hope you die and I hope [A.J.] dies. You understand me? I'm gonna show you how real I am, MFer. You're dead to me, b[****], you hear me? . . . I'm coming for you when I get out. You hear me? Watch, watch, watch. . . . I'm not coming after you, I'm coming after Lisa's husband for f[*****]g bringing guys around you. . . . Andrea, listen, I'm coming for you when I get out. You won't hear from me for another three years but watch your back when I get out. You hear me? I swear on [A.J.]'s beating heart. Watch your back." |

| | | |
|---|---|---|
| XIII-7/18/21 | Telephone A137-139; State's Ex. 12 at 02:57 to 03:40; 06:18 to 06:20; 06:58 to 07:05; 07:31 to 07:37 | " . . . and you need to start treating me with some kind of f[*****]g respect as a f[*****]g parent and stop s[*****]g* on me like I'm a f[*****]g nobody before I come home and f[**]k you up . . . I'm telling you, you're pushing me in a corner way too f[*****]g much, and I'm tired of being disrespected and treated like s[***] by you, and you're out there acting like a f[*****]g victim, and when I snap you want to run out to f[*****]g play f[*****]g victim . . . I'm not gonna be locked up forever. You fail to f[*****]g accept that. You keep treating me like s[***], and you're gonna f[*****]g regret it, Andrea . . ." "You're gonna regret treating me like s[***]" "You need your f[*****]g a[**] beat, that's what you need." "I'm gonna get you back for how you left me in here struggling like this, you understand me? I promise you that." |
| XIV-8/14/21 | Telephone A140; State's Ex. 14 at 1:31-1:50; 3:10- 3:20; 4:09-4:13 | "Listen. Adriana ran her mouth to me when I was in Pennsylvania on the phone, right? When I come home, I'm coming after her husband, and I'm gonna put him in the hospital. I swear I am. Watch me. Watch me. I'm telling you, I'm coming after Trevor. . . . Trevor's gonna care when I smash his teeth in and Adriana can't kiss him cuz' his jaw's wired up. I don't' forget s*** like that. . . . Tell Trevor I will be seeing him when I get home. " |
| XV-9/14/21 | Telephone A143-44; State's Ex. 16 at 0:50-1:09 | "Andrea, I'm going to come home and kill you, do you understand me? . . . I'm going to take you off this planet. . . . Andrea, you fat nasty pig, I'm going to rape you and rape your daughter, b[****], f[***] you." |
| XVI-9/16/21 | Telephone A146; State's Ex. 17 at 8:32-9:49. [Recording dated 9-16-2021 – 1703 (trial redaction)] | "[Mike Garnett] wanted to come talk to you--he just got out, he was my boy for real close an' he wants to f*** Drew up. He was gonna have a couple of Thunder Guard guys come f[***] and f[***] Drew up. He wanted Drew's address because they're taking a trip down South on a bike run and they were gonna jump on Drew and shoot him. But Mike wanted to come to your house and talk to you about it, not to cause you problems, they're after Drew because they feel like it's wrong to f[***] with another guy's girl when he's in jail. They want to shoot him. That's what Mike wants to do. They want to catch him slipping. Mike told me to tell you to not say nothing. Let him come around a few months and let him get comfortable and they're gonna catch him and they're |

| | | gonna shoot him. . . . . And listen when I get out, I'm not the one going to be doing Drew. I'm gonna have someone else take care of it because I can't come back to jail. I'm gonna let Mike and the Thunder Guards deal with it. . . . and one day he's gonna come out and get shot the f***** up." |
|---|---|---|
| XVII-9/18/21 | Telephone A151; State's Ex. 20 at 0:11-1:09; 2:48-3:31 [recording of 9-18-2021_835 trial redaction] | "You're gonna pay, do you hear me? . . . You think it's okay to ignore me all night? Who was you with— Arianna? Andrea, I'm not believing that. You have to come more than that or I'm going to bring problems to your house with [A.J.] there while you're asleep. . . . You guys have me so twisted, Andrea. . . . You're going to be really sorry. . . . Your family is going to miss you when they bury you. . . . I have nothing to lose. . . . I'm coming home for you. . . . I'm coming home to your doorstep, and you aren't gonna like what I'm bringing." |
| XVIII | Telephone A152- 53.; State's Ex. 21 at 08:55 to 09:30; 10:11 to 10:21 | "I'm going to call Mike when I get off and tell him to follow you around and shoot Drew. . . and if you're around, then you're going to catch a bullet, too. Cuz' Bambam already talked about coming after you, but I told him no, I just wanted Drew done. . . Listen, watch your back. . . . And if [A.J.] is around, she'll catch a bullet too. You understand me? . . . I just sent you a text saying don't worry about it, but I'm trying to set you up to be comfortable. Watch yourself. I'm done." |
| XIX-9/19/21 | Telephone A153; State's Ex. 21 at 08:55 to 09:07; 10:10 to 10:14 | "Drew is going to get shot. I'm going to call Mike when I hang up with you and tell him to follow you around and shoot Drew. . . and if [A.J.] is around she'll catch a bullet too. . . . . Watch yourself. I'm done." |
| XX-9/26/21 | Telephone A153-54; State's Ex. 19 at 03:53 to 04:04 | "Drew's gonna get beat the f[***] up and shot. I'm tellin' you. You think you're gonna go back to him? You keep--if you think you're gonna go back to him, you've got another think comin'." |
| XXI-9/26/21 | Telephone and text 9/26/21 A153-54; A349-351; State's Ex. 22 at 11:39 to 11:42 (9.26.21 1757 (Trial Redaction2).mp4) | "If you were in front of me, I'd punch you in your f[*****]g mouth." "My day is coming. I pray [A.J.] dies or get raped and I pray you die and get raped and used. How dare you throw Drew in my face." "I swear on [A.J.], you will pay for letting Drew tell you what to do. I f[*****]g told you if he called to ignore his calls. Instead you f[*****]g talked to him and let him change your mind. . . . Bam Bam knocks on your door early morning hours, I don't care. You want Drew |

| | | |
|---|---|---|
| | | over me." "Andrea, please talk to me. Please. . . . Now you're saying you need time. You only want time to f[***] Drew. You f[***] Drew, I'll kill you and do life in prison. I do not care at this point." |
| XXII-9/27/21 | Telephone A153-54; State's Ex. 22 at 00:00 to 00:33; 02:35 to 02:56 (9.27.21 1826 (Trial Redaction).mp4) | "Andrea, Andrea, listen to me. I'm going to kill you when I get out, do you understand that? I'm f[*****]g going to set you on fire and I'm going to f[*****]g beat the f[***] out of Drew. You hear me? Listen to me clearly. Listen to me clearly. No, listen to me. I'd do life. I'm going to kill you. I'm coming home for you. I'm going to kill you. I'm going to kill you. You hear me? I'm going to kill you. I swear on my daughter's beating heart I'm gonna come home and kill you. You understand me? I swear on everything. You better hope they don't, you better hope they don't let me out of jail, motherf[****]r. . . . I'm telling you right now, and I swear on my dead mom, I am coming home and I'm gonna put a bullet in your f[*****]g chest and I'll kill [A.J.], too. You understand me? I'm coming home to kill you. I swear to God, I'm coming home to kill you. And [A.J.]. You hear me? I'm coming home to kill you and [A.J.]. Goodbye.." |
| XXIII-9/27/21 | Telephone A153-54; State's Ex. 22 at 02:35 to 02:56 (9.27.21 1826 (Trial Redaction).mp4) | "I'm telling you right now, and I swear on my dead mom, I am coming home, and I'm gonna put a bullet in your f[*****]g chest and I'll kill [A.J.], too. You understand me? I'm coming home to kill you. I swear to God, I'm coming home to kill you. And [A.J.]. You hear me? I'm coming home to kill you and [A.J.]. Goodbye." |
| XXIV-9/10/21 | Text A526 | "Tell your b*** boy, I'm gonna f[*****]g beat the s[***] out of him when I get my hands on him!! . . . I'm not going away until I taste your mans blood on my hands!" |
| XXV-9/17/21 | Text A514 | "Just wait, have ur s[***] shot up while [A.J.] n you sleeping whore! . . . ur dead, [A.J.]s dead, drew's dead, watch." |
| XXVI-9/17/21 | Text A514 | "Just wait, have ur s[***] shot up while [A.J.] n you sleeping whore! . . . ur dead, [A.J.]s dead, drew's dead, watch." |
| XXVII-9/27/21 | Text A487 | "I'll DO LIFE IN PRISON JUST SO U WON'T BE WITH DREWN AND ILL DO LIFE SO [A.J.] DOESN'T HAVE HER MOM NOW IM IN A RAGE MFER U JUST TOLD ME LAST NIGHT U LOVED ME NOW ALLLL CUZ U GAVE IT N IT DREW U WANNA LEAVE ME AGAINST AFTER LAST NIGHT U TOLD ME U LOVE ME SEE ITS NOT |

| | | ADDING UP IF ITS NOT DREW ITS A DOWN DOWN SMYRNA THAT DID UR FEET." |
| --- | --- | --- |